L. H. BALDWIN ET AL. V. MAX GOLDFRANK ET AL.

No. 219.

1. **Deed—Secondary Evidence—Proof of Loss and Search.**—The rule admitting secondary'evidence of the execution and contents of a lost deed requires that diligent search should have been made for the deed of the proper persons and in the proper places, and the loss must be proved by the person in whose custody it was at the time of the loss, if he be living, and, if dead, application should be made to his representatives, and search made among his papers.

2. **Same—Presumption.**—The presumption that a deed is to be found in the possession of the heirs or legal representatives of the grantee therein is not overcome by proof that an attorney had it in possession for several years, but did not know what he had done with it.

3. **Same—Ancient Instrument—Proof.**—Where a deed attested by a witness is thirty years old, the grantor's signature may be proved by any one who knows it, without calling the subscribing witness, as it is presumed that the witness is dead.

4. **Same—Names of Grantors—"Heirs."**—A deed executed by one as attorney in fact for the "heirs of Antonio Rivas," does not convey title where the names of the heirs are not disclosed anywhere in the deed.

5. **Same—Reference to Ancient Power of Attorney.**—Nor is the omission to give the names of the grantors cured by the fact that the deed purports on its face to be executed by virtue of a power of attorney more than thirty years old, from the "heirs of Antonio Rivas," where it is not shown that the names of the heirs appeared in such power of attorney.

6. **Territorial Jurisdiction—Maverick County.**—Texas had jurisdiction over the territory now comprising Maverick County at and prior to February 8, 1850, the date of the act relating to Spanish land grants.

7. **Spanish Land Grants—Validity of Act.**—The Act of February 8, 1850, relating to Spanish land grants, and declaring void any sales of the lands pending official investigation thereunder of the titles, was not violative of the spirit of the treaty of Guadalupe Hidalgo, providing, that Mexicans in the disputed territory should be granted their property rights, since the object of the act was to protect these rights by suitable methods for their proof.

8. **Same—Fees—Taxation Uniform.**—The imposition of certain fees by that act to be paid by claimants for the examination of their titles was not violative of section 27, article 7, of the Constitution, requiring all taxation to be equal and uniform, since such fees were not imposed as a tax, or, if to be regarded as such, they were uniform as to the district and people affected.

9. **Same—Restriction Upon Alienations.**—The provision of that act declaring void any sales of the lands pending the official investigation of the titles was valid, and within the power of the State.

APPEAL from Bexar. Tried below before Hon. W. W. KING.

*S. M. Ellis, James Raley,* and *Simpson & James,* for appellants.

*Upson & Bergstrom* and *Denman & Franklin,* for appellees.

A full synopsis of the briefs of counsel appears in the further report of this case, in 88 Texas, 249.

FLY, ASSOCIATE JUSTICE.—This is an action of trespass to try title in and to one-half of 28 leagues and 10 labors of land patented to the

heirs of Antonio Rivas, in 1872. Appellees, who were defendants below, answered by pleas of not guilty, and limitation of three, five, and ten years. The case was tried with a jury, and the jury was instructed to return a verdict for appellees, which was done.

Upon the trial the court, upon objections urged by appellees, excluded proof of a certain deed purporting to have been given by Vicente Garza under and by virtue of a power of attorney from the heirs of Antonio Rivas (names of heirs not mentioned) to William Cazneau, bearing date July 12, 1852, and conveying one-half of the Antonio Rivas grant, in Maverick County. The deed had never been recorded. Appellees urged objections to the admission of the proof on the following grounds, to wit: "(1) The evidence above does not show that plaintiffs have made sufficient search for the original to allow them to introduce secondary evidence of the alleged deed of July 12, 1852. (2) The testimony of Oliphant, taken only a few days before the trial in Bexar County, Texas, does not show that he has made careful search for the said deed, or that he was requested so to do, and does not exclude the idea that the original may be still in the possession of Oliphant, or may be found by them, if diligently searched for. (3) That the testimony does not show sufficient search for the original among the papers of the Stone estate, in that no inquiry was made of the executrix of said estate for said deed. (4) That the deed offered to be proven was void on its face, in that it purports to have been executed by Vicente Garza, acting as an attorney for the 'heirs of Antonio Rivas,' without naming the persons whom said Garza considered to be the 'heirs of Antonia Rivas,' and whom he intended to bind by said deed; and therefore the grantors not being named on the face of the deed, for whom Garza intended to act, the court could not ascertain who were in fact the 'heirs of Rivas,' in order to make certain the grantors, in that, in order to do so, the court must begin with two presumptions—first, that Vicente Garza, when he signed the deed, knew the correct genealogy of the Antonio Rivas family; and second, that he came to a correct conclusion as to who of the many relations of Antonio Rivas were his heirs. Otherwise the court would make the deed binding on certain persons, when probably Garza attempted and intended to act for others; and the law will not, under the circumstances of this case, indulge in such presumptions in favor of the authority of Garza, and in favor of the validity of said deed, under which no title is shown to have been asserted for so many years. (5) The evidence was not sufficient to show the execution and delivery of the deed, or that W. L. Cazneau ever had possession of the instrument." The objections were sustained, and this action is assigned as error.

To satisfactorily discuss the assignment of error, it becomes necessary to give a synopsis of the testimony which was introduced as a foundation for the introduction of secondary evidence of the contents of the deed. It was shown that in 1885 or 1886, a witness, while in Eagle Pass, Texas, saw a deed which the witness recollects was an

original deed purporting to be from Vicente Garza, acting by virtue of a power of attorney from the heirs of Antonio Rivas, without giving their names, to William L. Cazneau, signed by Vicente Garza— but not for any particular heirs—purporting to convey a one-half interest in the Rivas grant, in Maverick County, Texas; that the deed was dated July 12, 1852, and was not recorded in Maverick County. The witness was not positive who had the deed when he saw it, but thinks it was either Judge J. A. Ware or A. M. Oliphant. The witness had a writen memorandum, taken at the time, which agreed with his testimony, except that it does not state what land was described in the deed. A. M. Oliphant testified, that in 1887 he was an attorney at Eagle Pass, and had a correspondence with R. W. O. McManus, about an interest claimed by W. L. Cazneau in the Rivas grant; that witness had received a deed purporting to be signed by Garza, and, as witness thought, to W. L. Cazneau, for an interest in the Rivas grant. This witness was quite uncertain and unsatisfactory in his testimony, and finally stated that he did not know where he got the deed, and did not know what he did with it; that he discontinued his correspondence with McManus, and no one calling for the deed, or making any mention of it for many years, and not thinking any question would arise making the deed of any consequence, witness thought he filed the deed with his old papers, which, in the course of time, have been lost.

It was shown that in 1877 or 1878 a deed from Vicente Garza, as attorney in fact of Antonio Rivas' heirs, to W. L. Cazneau, was sent to the county clerk of Maverick County by R. W. O. McManus for record, and the clerk would not record it because it was not acknowledged, and returned it to McManus, recommending that he send it to A. M. Oliphant. It was proved that the signature to the deed was that of Vicente Garza. The deed was afterwards seen by the clerk in the hands of A. M. Oliphant. The clerk, who swore to the above, also stated, that he had for many years prior to 1877 been county clerk, and had never heard of any claim that Cazneau had to the Rivas grant until the Garza deed was filed for record. It was shown that inquiry was made of Judge J. A. Ware about the deed, and he stated if he ever had such a deed, it would be among the papers of the Stone estate, and James W. Riddle, at Eagle Pass, represented that estate, and had charge of its papers; that Riddle, when asked about the papers, exhibited a lot of documents pertaining to the Stone estate, stating that they were the papers of the estate, relating to its property; that the deed was not found among these papers. Mrs. Stone was the executrix of the estate, but no inquiry was made of her about the deed. She was still executrix at the time of the trial, and still resided at Eagle Pass. It was shown that R. W. O. McManus was the attorney of W. L. Cazneau, with authority to manage and sell the latter's Texas lands. A deed from Vicente Garza, for himself, and as attorney in fact for a number of the named heirs of Antonio Rivas, to John C. Crawford, and through which appellees claim, was also introduced in

evidence. It was of date November 1, 1876, and was duly acknowledged and recorded on November 27, 1876. Inquiry was made of A. M. Oliphant for the deed, and Oliphant stated that he did not have it, and told the inquirer where he would find his old papers. Search was made for the old papers at the place indicated by Oliphant, and none were found. This is all the testimony that was introduced on the subject of loss of the deed, and search for it.

While there is some doubt as to whose possession the deed was in when seen by the witness who testified as to its contents, there is no doubt but that the deed was in the hands of A. M. Oliphant for some years. The proof of the existence of the deed, and that it was signed by Vicente Garza as attorney for heirs of Antonio Rivas is, we think, sufficient. Clapp v. Engledow, 82 Texas, 290. Oliphant is very uncertain as to what he did with the deed, and is not positive whether he gave it to any one or not. Oliphant made no search whatever for the deed, and neither is it shown that McManus did not have the deed among his papers. No inquiry was made of Mrs. Stone, the executrix of the Stone estate, as to whether she had the deed. The testimony about the papers of the Stone estate, which were in the hands of Riddle, does not exclude the idea that there were other papers belonging to the estate. There is no positive testimony that the deed was lost or destroyed. Was the testimony sufficient to admit secondary evidence of the contents of the deed? The rule, compliance with which is required to justify the admission of secondary evidence of the execution and contents of a lost instrument, is, that it must be proved that there has been diligent search, and inquiry made of the proper persons, and in the proper places, for the lost instrument; that the loss must be proved by the person in whose custody it was at the time of the loss, if he should be living, and, if dead, application should be made to his representative, and search made among the papers of deceased. Trimble v. Edwards, 84 Texas, 497; Hill v. Taylor, 77 Texas, 299; Vandergriff v. Piercy, 59 Texas, 372.

In the case of Hill v. Taylor it is said: "It is not shown that inquiry was made of the vendees, or, if dead, of their representatives. Nor does the affidavit exclude the idea or supposition that the plaintiff may have been able to produce the original deed." In this case there is no affidavit or testimony that shows that the deed might not be among the papers of appellants' ancestor, W. L. Cazneau. The only testimony that tends to show the loss of the deed is that of Oliphant, and he does not know what become of the deed, and does not swear positively that it was lost, or that he had ever looked for it. In the case of Bounds v. Little, 75 Texas, 316, it is said, that if the deed was ever executed the presumption would obtain that it would be found in the possession of the heirs or legal representatives of the person to whom it was made. We do not think that presumption has been rebutted in this case by proof of the fact that Oliphant at one time had the deed in possession, and when he does not swear that he did not

return the deed to McManus or Cazneau, or his heirs.   Neither of the appellants (plaintiffs in the court below) swore that the deed was not in their possession, and this becomes the more significant as one of the appellants testified in the case, and did not mention the loss of the deed.   We are of the opinion that the testimony as to the loss of the deed, and the search for it, was not sufficient to admit proof of the contents of the deed.   The magnitude of the interests at stake should cause the testimony of loss and search for the deed to be very closely scrutinized before secondary proof could be admitted of its contents.

The second assignment of error attacks the action of the court in excluding from the evidence a certain deed by Vicente Garza to William L. Cazneau, of date August 19, 1850, conveying one-half of the Rivas grant.   The deed was objected to because it was void under the Act of February 8, 1850, which provided for investigation of certain Spanish titles, and because the witness to the deed was not called to prove the execution of the deed, and there was no proof that the deed was delivered to Cazneau.   It is urged by appellants that the law of February 8, 1850, is unconstitutional, because Texas had no jurisdiction over the land in controversy until the passage of the act by the American Congress, in November, 1850, and because the law imposes a tax on the land claimant that is not uniform, and that is violative of the treaty of Gaudalupe Hidalgo, made between the United States and Mexico in 1848.

Texas acquired her territory by the valor of her sons, and not by any cession from the United States.   After the battle of San Jacinto, on April 21, 1836, the land sued for, which is now Maverick County, was claimed to be under the jurisdiction of the Texas Republic; and on the 19th day of December, 1836, the Congress of the Republic declared its western boundary to begin at the mouth of the Rio Grande, and to run thence up the principal stream of said river to its source.   Pasch. Dig., art. 438.   It is true that the portion of Texas between the Nueces and the Rio Grande was claimed by Mexico up to February 2, 1848, when the treaty of Guadalupe Hidalgo was entered into between the United States and Mexico, by which it was declared that the Rio Grande should be the boundary line between the United States and Mexico.   By the articles of annexation, by which Texas entered into and became a part of the American Union of States, it was conceded by the United States, "that the territory properly included within and rightly belonging to the Republic of Texas may be erected into a new State, to be called the State of Texas," the only condition as to the boundaries being, that the United States government should adjust matters of difference between Texas and foreign governments.   Pasch. Dig., p. 44.   The articles of annexation were formally adopted by a convention of the people on July 4, 1845; and on December 29, 1845, the Congress of the United States admitted Texas into the Union.   Pasch. Dig., pp. 45, 46.

In 1846 the Legislature of Texas declared, "that the exclusive right to the jurisdiction over the soil included in the limits of the late Republic of Texas was acquired by the valor of the people thereof, and was by them vested in the government of the said Republic; that such exclusive right is now vested in and belongs to the State, excepting such jurisdiction as is vested in the United States, by the Constitution of the United States, and by the joint resolution of annexation, subject to such regulations and control as the government thereof may deem expedient to adopt." Pasch. Dig., art. 441. Texas had claimed the Rio Grande as its western boundary from 1836; and the United States, in the articles of annexation, recognized its boundaries, subject to adjustment of disputes that might arise with other governments, and when the boundary was adjusted by the treaty of Guadalupe Hidalgo, in 1848, all connection of the United States with the disputed territory ceased. The Act of November 25, 1850, by the Congress of the United States, was not one ceding territory to Texas, for it had none in Texas to cede, but seems to have been passed not with reference to the Rio Grande boundary, but with reference to the boundary on the north and northwest, where the United States were claiming lands which they placed a price upon, and bought. Pasch. Dig., art. 443.

The land in controversy was within the jurisdiction and subject to the laws of Texas, when the Act of February 8, 1850, relating to Spanish grants, was passed. Without entering into any elaborate discussion of that act, we are of the opinion that it is not obnoxious to section 27, article 7, of the Constitution of 1845, which provides, that all taxation shall be uniform and equal; and neither is it violative of the spirit of the treaty of Guadalupe Hidalgo, which provides, that Mexicans in the disputed territory should be granted their property rights. The object of the law was to provide a mode of proving up titles to lands in certain counties, and was passed, not to impose burdens on the claimants of lands, but to protect them in their rights, and provide a way for them to make proof of their claims. The fees which the act provides that they shall pay were not imposed as a tax, and, if they were, were uniform as to the district and people affected. The law having been passed in the interest of certain people, they were called upon, if they desired the benefits of the law, to pay certain fees to the commission that would investigate their titles. While the constitutionality of the act in question has never been directly passed upon, yet it has been discussed often by the Supreme Court of Texas, and acted upon as constitutional and valid. The State v. Sais, 47 Texas, 309; The State v. Cardinas, Id., 281; Clark v. Hills, 67 Texas, 144; and a number of others.

Paschal's Digest, article 4455 (Act February 8, 1850), provides, that "No sale by any claimant of lands under the provisions of this act shall take place until after a title to the same shall have been confirmed to the original claimant or claimants; but all such sales of lands

or claims to lands shall be void; and no claims to lands in the hands of a third person shall be recognized by the Board of Commissioners, unless the sale or transfer of the same was made prior to the passage of this act." If this portion of the law of February 8, 1850, is valid, the deed from Vicente Garza to W. L. Cazneau, dated August 19, 1850, was a nullity, and was properly excluded, and it would become unnecessary to pursue the subject further. That the claim to this land was brought before the commission, and was reported favorably, is evidenced by the Act of September 4, 1850, which confirms, among others, the grant to "Antonio Rivas, twenty-five leagues, called the Rivas grant," in what was then Kinney County (Paschal's Digest, article 4459); this claim having doubtless been made before the commission contemplated by the Act of February 8, 1850, as is shown by the caption of the Act of September 4, 1850. The deed made by Vicente Garza to Cazneau came directly within its provisions, and, if the law is valid, it applies to this case.

The law prohibiting the sale of lands pending the report of the commissioners, and confirmation of the same, was evidently passed in the interest of the claimants, to protect them from land speculators while they were in doubt as to their rights, as well as to protect the commission from the importunities and pressure of speculators who had bought titles. The titles of the parties in whose interest the act was passed were in an inchoate condition; and while, ordinarily, the State has no authority to interfere with the alienation of property, we can see no reason for holding that it was not within the power of the State to say to claimants of lands: "The State intends to investigate the titles under which you claim; and to prevent imposition and fraud to be practiced upon you and upon the State, and to prevent confusion, it demands that you make no sales of your claims pending the investigation. But, if you sell any way, the State will not impair any of your rights, but says to the buyer of your lands, that the sale to him shall be null and void." The lands in the counties mentioned in the act had not been patented by the State, and in complying with the treaty with Mexico it had, we think, while the investigation of the titles was in progress, the right to put certain restrictions on the alienation of their inchoate rights by claimants. The law only applied to sales made during the progress of the investigation, and we think was within the police regulation of the State. Tied. Lim., sec. 119. We are of the opinion, that the deed of date August 19, 1850, was null and void, and, if proper in other respects, conveyed no title to Cazneau. Hunt v. Robinson, 1 Texas, 747; Ledyard v. Brown, 27 Texas, 393.

The deed in question was recorded in November, 1876, but improperly so, as the acknowledgment was taken by a justice of the peace, and there was no impress of a seal, or anything in the certificate to show that a seal was used. There was no evidence that Vicente Garza ever delivered the deed to Cazneau, or that Cazneau was ever in possession of it. There was a subscribing witness to the deed, and it

was not shown that he was dead; but, the deed having been executed more than thirty years, the presumption would be that he was dead, and the signature could be proved by any one who knew it.   Hollis v. Dashiell, 52 Texas, 187.

We are of the opinion that the deed first mentioned was void, because it failed to disclose the names of the principals.   The power to execute the deed, after the lapse of thirty years, would be presumed; but we have seen no authority that will carry the presumption further, and say, not only that the maker of the deed had the power to execute the deed, but also that the persons who signed the power were the heirs of a certain person.   We would not only be compelled to presume that the persons were the heirs of Rivas, but, in addition, if afterwards it should be shown who the heirs were, we must presume that their names were signed to the power of attorney.   The presumption, if admitted at all, certainly can not go further than to say that the power of attorney was signed, "Heirs of Antonio Rivas;" for we could go no further in our presumption than the recital in the deed, which is, that the power of attorney was executed by the heirs of Antonio Rivas.   But we do not think that a power of attorney signed by "Heirs of Antonio Rivas" would be valid, or would confirm any power.   Unless the deed had referred to the power of attorney for the names, and the same were set forth in the power of attorney, we do not believe that a deed signed by the attorney simply as the agent or attorney of certain heirs, without naming them, would convey any title.   In such a case the agent could do no more than his principal, and it will not be seriously contended that a deed signed by the "Heirs of Antonio Rivas," without the names anywhere appearing, either in the body of the deed, or at the end of it, would be a valid conveyance. Who these heirs were, who had designated them as heirs, and how many had signed the power of attorney, can not be ascertained from any recital in the deed.   Martind. Conv., sec. 246.   The recital of the names in the deed made by Vicente Garza to Crawford does not show who had given the power of attorney to Garza, under which he acted in 1852.   The authority for his action in 1876 may have been obtained long after the deed of 1852 was executed.   We are of the opinion that both of the deeds were properly excluded as evidence, and the judgment is affirmed.

*Affirmed.*

Delivered March 14, 1894.


ON REHEARING.


FLY, ASSOCIATE JUSTICE.—The portion of our opinion referring to the power of attorney to Garza seems to be misapprehended by appellants.   We do not hold that it would not be presumed, in the case of an ancient instrument, that the power of attorney was in existence, as detailed in the ancient deed, but we do hold, that the presumption can

go no further than the recitals in the deed. If the deed says that the power of attorney was signed "Heirs of Antonio Rivas," we can not go further, and say that the names of these heirs were specifically set forth in the power of attorney. Presuming, in favor of the power of attorney, everything expressed in the deed, and we do not have a valid power of attorney. If the power of attorney, executed as stated in the deed, had been produced, we are of the opinion it would, standing alone, and unsupported by evidence aliunde, have been an invalid instrument. The names of the heirs are not disclosed in the deed, and there is nothing to indicate that they were disclosed in the power of attorney. The motion for rehearing is overruled.

*Motion overruled.*

Delivered April 18, 1894.

James, Chief Justice, did not sit in this case.

Writ of error granted by Supreme Court, and judgment affirmed. See 88 Texas, 249.